# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DAVID CONERLY,<br>Defendant. | Case No. 17-cr-00578-JSW-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 28 |

Now before the Court for consideration is the motion to suppress filed by Defendant David Conerly. The Court has determined that an evidentiary hearing is not required. The Court has considered the parties' papers, relevant legal authority, and the record in this case. For the following reasons, the Court DENIES Defendant's motion to suppress.

## BACKGROUND

**A.  Defendant's Arrest.**

On November 2, 2017, officers from the Berkeley Police Department ("BPD") responded to a call reporting a domestic violence incident. (Dkt. No. 30, Declaration of Beth Alvarez ("Alvarez Decl."), Ex. 1 ("Police Reports") at 17[1].) After conferring with the victim and obtaining a description of the suspect, officers spotted Mr. Conerly, who matched the victim's description. (*Id.* at 17, 30.) Officers called out to Mr. Conerly and, when he ran, pursued him. (*Id.*) In flight from the police, Mr. Conerly jumped a fence between two houses and then tried to scale a taller chain link gate. (*Id.*) An officer pulled Mr. Conerly off the gate and, after a brief struggle, placed him under arrest for domestic violence and obstruction. (*Id.* at 18.) Police searched Mr. Conerly

---

[1] For ease of reference, page numbers to exhibits reference the docket page.

1    several times during his arrest and found .40-caliber ammunition, drugs, over $700 in cash, and a

2    cellphone (evidently in Mr. Conerly's pocket). (*Id.* at 8, 18, 19, 24, 27, 29-31.) In front of the

3    chain link gate Mr. Conerly tried to climb, police also found a .40-caliber Glock handgun with a

4    partially un-holstered magazine. (*Id.* at 18, 19, 31.)

5          On November 6, 2017, Mr. Conerly was arraigned in the Superior Court for the County of

6    Alameda. (Dkt. No. 28-1, Declaration of Alan A. Dressler ¶ 2; Dkt. No. 28-2, Ex. A.) He was

7    charged (in part) with assault with a deadly weapon other than a firearm, possession of drugs,

8    being a felon in possession of a firearm, and unlawfully possessing ammunition. (Dkt. No. 28-2,

9    Ex. A at 2-3.) Mr. Conerly entered a plea of not guilty and was shortly thereafter released on bail.

10   BPD retained custody of the cellphone and other items seized incident to Mr. Conerly's arrest.

11   (Alvarez Decl. ¶¶ 4, 5.)

12   **B.    First Search Warrant.**

13         On November 15, 2017, Federal Bureau of Investigation ("FBI") Special Agent Beth

14   Alvarez sent the United States Attorney's Office a partially complete draft affidavit in support of

15   an application for a search warrant for the cellphone. (*Id.* ¶ 4.) On November, 16, 2017, Mr.

16   Conerly was indicted by a federal grand jury for being a felon in possession of a firearm and

17   ammunition, and a warrant issued for his arrest. The same day, the FBI collected some of the

18   evidence BPD still held, including the cellphone. (*Id.* ¶ 5.) Once the FBI came into possession of

19   the phone, Agent Alvarez filled in the missing components of her affidavit. (*See id.*)

20         In her affidavit, Agent Alvarez explained that, based on her experience, she expected the

21   cellphone might contain "trophy shots" of Mr. Conerly with the .40-caliber Glock seized incident

22   to his arrest and/or photographs, calls, and/or text messages related to drug dealing. (Dkt. No. 28-

23   2, Ex. C ("First Search Warrant Application") ¶¶ 11, 12.) She anticipated that such evidence

24   could be helpful in confirming that Mr. Conerly was the owner or possessor of the Glock and/or

25   that Mr. Conerly was selling drugs. (*Id.*)

26         Monday, November 20, 2017 to Friday, November 24, 2017 was Thanksgiving week, and

27   Assistant United States Attorney ("AUSA") William Gullotta was away from the office. (Dkt.

28   No. 31, Declaration of William J. Gullotta ("Gullotta Decl.") ¶ 3.) AUSA Gullotta returned to the

1  office on Monday, November 27, 2017 and submitted Agent Alvarez's completed affidavit. (*Id.*
2  ¶ 4.) On or about the same day, Mr. Conerly was arrested in the Central District of California
3  pursuant to the federal warrant. (Dkt. No. 28-2, Ex. B.) He has since remained in custody.

4        On November 30, 2017, Magistrate Judge Kandis A. Westmore contacted AUSA Gullotta
5  and asked the government to supplement its search warrant application to include the location of
6  Mr. Conerly's cellphone on his person at the time of his arrest. (Gullotta Decl. ¶ 5.) Agent
7  Alvarez updated her affidavit to state that BPD located the cellphone in one of Mr. Conerly's
8  pockets. (Alvarez Decl. ¶ 6.) On December 7, 2017, AUSA Gullotta submitted the supplemented
9  search warrant application to Judge Westmore. (Gullotta Decl. ¶ 7.)

10        On December 13, 2017, Judge Westmore issued a warrant authorizing the search of Mr.
11  Conerly's cellphone. (Dkt. No. 28-2, Ex. D ("First Search Warrant") at 21.) The same day, Agent
12  Alvarez checked Mr. Conerly's phone out of the FBI Evidence Control Unit. (Alvarez Decl. ¶ 9.)
13  When she began to search the cellphone, she learned it was password protected, which prevented
14  her from searching the entire contents of the phone. (*Id.*) The same day she encountered the
15  password security feature, Agent Alvarez contacted the FBI's Regional Computer Forensics
16  Laboratory ("RCFL") in Menlo Park, California, to determine if RCFL would be able to bypass
17  the password and facilitate search of the rest of the contents of Mr. Conerly's cellphone. (*Id.*
18  ¶ 10.) RCFL said it could not. (*Id.*)

19        That same day, Agent Alvarez followed RCFL's advice and submitted a Mobile Device
20  Unlock Request ("MDUR") to the FBI's Electronic Device Analysis Unit ("EDAU") in Quantico,
21  Virginia. (*Id.* ¶ 11.) EDAU instructed Agent Alvarez to retain the cellphone until EDAU
22  indicated it was ready to receive it. (*Id.*; Dkt. No. 38-1, Ex. C ("Dec. 13, 2017 Email").) The first
23  search warrant expired on December 27, 2017, without word from EDAU. (First Search Warrant
24  at 21.)

25        On January 3, 2018, Agent Alvarez followed up with EDAU regarding the status of her
26  MDUR. (Alvarez Decl. ¶ 12; Dkt. No. 38-1, Ex. D ("Jan. 3, 2018 Email").) EDAU informed her
27  it was still not ready to receive the cellphone. (Alvarez Decl. ¶ 12.) Roughly a month later, on
28  February 5, 2018, Agent Alvarez again contacted EDAU to inquire if she could send the cellphone

3

1  to Quantico for password circumvention and data retrieval. (*Id.* ¶ 13.) The next day, EDAU told

2  Agent Alvarez she could send Mr. Conerly's cellphone, but warned her that the phone was

3  possibly encrypted, which could further slow the retrieval process. (*Id.* ¶ 14; Dkt. No. 38-1, Ex. E

4  ("Feb. 2018 Email Exchange.")

5        On February 7, 2018, while Agent Alvarez was listening to some of Mr. Conerly's

6  recorded jail telephone calls, she heard Mr. Conerly describe a six-digit numerical password he

7  used to access some of his personal information. (Alvarez Decl. ¶ 15.) Agent Alvarez decided to

8  test whether this number would unlock Mr. Conerly's cellphone. (*Id.*)

9  **C.   Second Search Warrant.**

10       Before attempting to unlock the cellphone using the numerical password, Agent Alvarez

11 contacted the United States Attorney's Office to determine whether she needed to apply for a new

12 search warrant to search the cellphone. (*Id.* ¶ 16.) The government determined that applying for a

13 second warrant was appropriate. (*Id.*) In the affidavit supporting the second search warrant

14 application, Agent Alvarez stated that, since her first search of the cellphone, she had learned that

15 the FBI might be able to bypass the cellphone's password security feature and had discovered

16 what might be a password to the cellphone. (*Id.*; Dkt. No. 38-1, Ex. F ("Second Search Warrant

17 Affidavit") ¶ 7.) The government applied for a second warrant to search Mr. Conerly's cellphone

18 on March 6, 2018, and, on March 8, 2018, Magistrate Judge Donna M. Ryu issued the warrant.

19 (Alvarez Decl. ¶¶ 17, 18.)

20       The same day the second search warrant issued, Agent Alvarez entered the six-digit

21 password she gleaned from Mr. Conerly's recorded call and "unlocked" and "image[d]" Mr.

22 Conerly's phone. (*Id.* ¶ 19.) While reviewing the phone's contents, Agent Alvarez found a

23 photograph of the Glock handgun seized during Mr. Conerly's arrest (the make and serial number

24 of the seized gun and the gun in the photograph are identical). (*Id.* ¶¶ 20, 21.) The photograph

25 was dated October 31, 2017. (*Id.* ¶ 21.)

26       Mr. Conerly moves to suppress any evidence obtained from the imaging of his cellphone

27 on March 8, 2018 or thereafter.

28 //

# ANALYSIS

## A.  Applicable Legal Standard.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . . ." U.S. Const. amend. IV. Generally, warrantless searches and seizures are unreasonable, unless justified by an exception, and the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

Law enforcement officers may perform a warrantless arrest where they have probable cause to believe an individual has committed a crime. *See Crowe v. County of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) ("Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed . . . an offense." (citation omitted)). Incident to a lawful arrest, law enforcement officers are authorized to conduct a search of the arrestee and the areas within his immediate control. *Chimel v. California*, 395 U.S. 752, 762–63 (1969). The aim of such permitted searches is to disarm the arrestee and to prevent him from destroying evidence. *Id.* Law enforcement may seize an item discovered in such a search if the officer has probable cause to believe the item is—or contains evidence of—a crime. *United States v. Place*, 462 U.S. 696, 701 (1983).

A search incident to a lawful arrest implicates a defendant's possessory and privacy interests in any item seized: a seizure without a search affects only possessory interests, while a search affects privacy interests. *Segura v. United States*, 468 U.S. 796, 806 (1984) (plurality opinion). Authorities must procure a warrant before searching certain kinds of items seized incident to an arrest, including cellphones. *Riley v. California*, __ U.S. __, 134 S. Ct. 2473, 2493-95 (2014).

Seizing an item incident to a lawful arrest does not grant officers indefinite powers to hold the item. An "unreasonable" delay between when an item is seized and when authorities apply for a warrant to search it may violate the Fourth Amendment, even where the seizure of the item was

5

1    initially constitutional. *See United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015). To

2    assess the reasonableness of any delay, courts must balance the nature and quality of the intrusion

3    on the individual's Fourth Amendment interests against the importance of the governmental

4    interests used to justify that intrusion. *Id.* In performing this balancing test, courts consider the

5    totality of the circumstances in any given case. *See id.*

6         Mr. Conerly does not contest the lawfulness of either his arrest or of the seizure of the

7    cellphone incident to that arrest. Accordingly, the Court focuses its analysis on whether the delay

8    between the seizure of Mr. Conerly's cellphone and the search pursuant to the second search

9    warrant violated his Fourth Amendment rights. Given the totality of the circumstances, this Court

10   holds that the delay did not violate Mr. Conerly's Fourth Amendment rights.

11   **B.     The Intrusion Into Mr. Conerly's Fourth Amendment Interests Was Minimal.**

12        The Court first examines the extent to which the government intruded into Mr. Conerly's

13   Fourth Amendment interests in his cellphone. As the question before the Court is whether the

14   government's seizure of Mr. Conerly's cellphone was reasonable, the Court examines Mr.

15   Conerly's possessory, rather than his privacy, interests in the device.

16        Generally, an individual has a strong possessory interest in his cellphone. The Supreme

17   Court has recognized that cellphones are a "pervasive and insistent part of daily life" that place

18   "vast quantities of personal information literally in the hands of individuals." *Riley*, 134 S. Ct. at

19   2484-85. As a result, searching a person's cellphone "would typically expose to the government

20   far *more* than the most exhaustive search of a house: A phone not only contains in digital form

21   many sensitive records previously found in the home; it also contains a broad array of private

22   information never found in a home in any form . . . ." *Id.* at 2491 (emphasis in original). Given

23   the storage capacity of modern cellphones, there is often a high likelihood that a seized phone

24   contains ample material with no evidentiary value. *See United States v. Mitchell*, 565 F.3d 1347,

25   1351 (11th Cir. 2009). Further, cellphones act not only as repositories, but as tools for their

26   owners. Indeed, modern cellphones are more like computers than telephones: they "could just as

27   easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries,

28   albums, televisions, maps, or newspapers." *Riley*, 134 S. Ct at 2489.

1    All things being equal, therefore, Mr. Conerly's has a heightened possessory interest in his

2    cellphone—not just because of the cellphone's potential contents, but because cellphone owners

3    often depend upon their devices for a variety of tasks, great and small.  Yet, an individual's

4    possessory interest in his cellphone is not absolute.  In determining the strength of possessory

5    interest, courts examine the defendant's expressed interest in recovering the seized object and the

6    defendant's ability (or need) to use the object during the time he is deprived of it.  If a defendant

7    (i) was in custody during the delay between the item's seizure and the procurement of a search

8    warrant and/or (ii) did not seek to have the property returned to him or, released to a third party,

9    his possessory interest in the seized item is often reduced, even if that item is his cellphone.  *See*

10   *United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017) (defendant's possessory interest in

11   cellphone minimal where defendant in custody during cellphone's retention and never sought its

12   return); *Sullivan*, 797 F.3d at 633-634 (possessory interest reduced because defendant in custody

13   during seizure of laptop, did not claim he would be able to use it while in custody, and did not

14   seek its release).

15   Here, save for a brief stint when he was released on bail, Mr. Conerly has been in custody

16   the entire time of the cellphone's seizure.[2]  Mr. Conerly does not claim he would have been

17   permitted to use the phone while in state and federal custody had his phone been returned to him.[3]

18   *See, e.g., Sullivan*, 797 F.3d at 633 ("Where individuals are incarcerated and cannot make use of

19   seized property, their possessory interest in that property is reduced."); *United States v.*

20   *Kowalczyk*, No. 08-cr-95-KI, 2012 WL 3201975, at *23 (D. Ore. Aug. 3, 2012) (weeklong delay

21   reasonable where defendant in custody and therefore unable to use seized computer and digital

---

[2] Mr. Conerly was released on bail on or about November 6, 2017 through November 27, 2017, when he was arrested pursuant to the federal indictment.  Mr. Conerly has been in custody since November 27, 2017.  The cellphone was in BPD's possession from November 2, 2017 to November 16, 2017, at which point the cellphone and other items were transferred to the FBI.

[3] In this way, the cases upon which Mr. Conerly relies are readily distinguishable from the facts at hand.  For example, in *United States v. Dass*, 849 F.2d 414 (9th Cir. 1988), neither the intended recipients nor the senders of the articles seized (packages being processed by the United States Postal Service) were in police custody during the period the packages were held by authorities.  Further, in *United States v. Mitchell*, 565 F.3d 1347, 1349 (11th Cir. 2009), the defendant was not in custody while the FBI held his hard drive.

7

1  devices). Additionally, there is nothing in the record to suggest that Mr. Conerly ever requested
2  the return or release of his cellphone—even while out on bail and theoretically able to use the
3  device. *See, e.g., United States v. Ditirro*, No. 16-cr-216-KJD-VCF, 2017 WL 6029685, at *6-8
4  (D. Nev. April 17, 2017) (delay of nearly three months between seizure of SD card and application
5  for warrant to search not unreasonable where defendant did not seek return of SD card).

Accordingly, Mr. Conerly had a reduced possessory interest in the seized cellphone. Under these circumstances, the government's actual interference with Mr. Conerly's Fourth Amendment interests in that device was minimal. *See Sullivan*, 797 F.3d at 634.

**C.  The FBI Possessed a Legitimate Investigatory Interest and Was Not Dilatory.**

Balanced against Mr. Conerly's reduced possessory interest in his cellphone, the Court must consider the strength of the government's interest in retaining the phone while it obtained and executed a search warrant. Law enforcement has a legitimate interest in preserving evidence of a crime. *See, e.g.*, *Sullivan*, 797 F.3d at 634 (recognizing the government's interest in "retaining and searching the laptop for evidence of crimes" given the "likelihood that it contained evidence of [defendant's] parole violations, as well as child pornography"). In the affidavit in support of the search warrant application, Agent Alvarez stated that, based on her training and experience, individuals who own guns or deal drugs often use their cell phones to take pictures of their guns or drugs (so called "trophy shots"). (First Search Warrant Application ¶¶ 11, 12.) She also stated that individuals involved in drug dealing frequently use cell phones for organizing and executing drug deals. *Id.*[4] Given Agent Alvarez's showing, and the totality of the circumstances, the FBI had a legitimate interest in retaining the cellphone to permit the FBI to complete its search of the phone and preserve evidence of criminal activity.

In determining whether the interference with an individual's possessory interest is unreasonable, the Court must also examine whether the police diligently pursued their investigation during the time the item was seized. *Place*, 462 U.S. at 709. An unexplained delay in procuring a warrant to search diminishes the state's justification for intruding upon an

---

[4] Notably, Mr. Conerly does not contest that the government had a sufficient basis for believing the cell phone contained evidence of criminal activity.

8

1 individual's possessory interest. *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) (unexplained delay suggests police indifference). Here, on balance, the Court finds that the investigatory pace, while suboptimal, was not unreasonable.

The delay between the seizure of Mr. Conerly's phone and its ultimate search pursuant to the second warrant falls into two distinct phases: the first encompassing the period between the phone's seizure[5] and EDAU's indication that it could receive the cellphone for analysis, and the second, the discovery of the suspected passcode of the phone and the application for the second search warrant. The early inefficiencies in the expedient procurement of the first search warrant are explained by holiday-related travel, the timing of the federal indictment, the transferring of the cellphone to the FBI, Agent Alvarez's supplementation of her affidavit at Judge Westmore's request, communication with the AUSA, and waiting for Judge Westmore to issue the warrant. Agent Alvarez's inability to complete data retrieval before the first warrant expired was due to the administrative backlog of the FBI's technical teams. *See Johnson*, 875 F.3d at 1276 (excusing delay due to difficulties technical unit experienced attempting to retrieve data from seized cellphone). The Court finds that these investigatory delays were not negligent or dilatory. *See id.*

Indeed, Agent Alvarez exhibited a desire to quickly execute a lawful search of the cellphone. She began preparing her affidavit for the first search warrant before the federal indictment issued and executed the first search warrant the day it issued. Immediately after determining the phone was password protected, Agent Alvarez sought help from the RCFL and, when that resource was unavailing, the EDAU. She adhered to EDAU's instructions to retain the cellphone and wait, but, having heard no update from the unit, followed up with EDAU twice to see if it was yet ready to act on her request. The Court finds that the intervals Agent Alvarez waited to follow up with the EDAU (three weeks and then a month) were reasonable, given her impression of the nature of the EDAU backlog. *See Mitchell*, 565 F.3d at 1352-53 (court "sympathetic" to argument that some delay in obtaining investigatory assistance was reasonable).

---

[5] The Court assumes, without deciding, that Mr. Conerly's characterization of the length of the delay (beginning with the phone's seizure by BPD rather than the transfer of the phone to the FBI) is correct.

9

The second phase of the delay presents a slightly closer question as to investigatory diligence. On February 7, 2018, the day after EDAU told her it was ready to receive the cellphone, Agent Alvarez discovered the six-digit code she believed would enable her to unlock the cellphone herself. Despite believing that this code would expedite the search, Agent Alvarez waited a month to apply for the second search warrant. The Court believes the FBI and United States Attorney's Office likely could have moved more expeditiously to obtain the second search warrant. Nonetheless, even if the FBI could have moved faster to obtain the second search warrant, "reasonableness" does not depend on whether the government pursued the "least intrusive course of action." *Sullivan*, 797 F.3d at 634. Further, this Court's "hindsight" observation that the procurement of the second warrant was perhaps slower than it might have been does not mean that the government's conduct was unreasonable. *See Burgard*, 675 F.3d at 1034 ("We do not want to discourage this sort of careful, attentive police work, even if it appears to us that it could or should have moved more quickly. Encouraging slapdash work could lead to a variety of other problems.").[6]

As Mr. Conerly's possessory interest in the cellphone during his incarceration was diminished, the Court finds that the balancing test for reasonableness tilts in the government's favor. *See Sullivan*, 797 F.3d at 635 (unexplained twenty one-day delay in obtaining search warrant for seized laptop reasonable); *cf. United States v. Martinez*, No. 13-cr-794-WHA, 2014 WL 3956677, at *1 (N.D. Cal. Aug. 12, 2014) (eight month delay of warrantless search of cellphone seized incident to arrest not unreasonable where parolee in custody). The delay in completing the search of the cellphone was "unfortunate, but reasonable under the totality of the circumstances." *See Kowalczyk*, 2012 WL 3201975, at *23. Moreover, considering all circumstances of the seizure and search of the cellphone, suppressing evidence obtained pursuant

---

[6] Mr. Conerly suggests, but never expressly argues, that Agent Alvarez misrepresented a number of the events underlying the delay. Specifically, he argues that Agent Alvarez's sworn statements (the affidavit in support of the second search warrant and her declaration in support of the government's opposition) are inconsistent with each other and with emails between Agent Alvarez and the EDAU. The Court disagrees. Read in their entirety, the Court finds that there is no inconsistency between Agent Alvarez's emails with EDAU, her affidavit in support of the second search warrant, and her declaration in support of the government's opposition.

10

to the second warrant would not serve the purpose of the exclusionary rule. *See Davis v. United States*, 563 U.S. 229, 237 (2011) (sole purpose of rule is deterrence).

### CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion to suppress. The hearing scheduled for June 5, 2018 at 1 p.m. is HEREBY VACATED. The Court will, however, hold a status conference in this matter at the same date and time. If the parties believe that time between the date of this Order and June 5, 2018 should be excluded from the Speedy Trial Act calculation, they may submit a stipulation and proposed order documenting the basis for any such exclusion.

**IT IS SO ORDERED.**

Dated: May 30, 2018

_____
JEFFREY S. WHITE
United States District Judge